UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| LUTHER PARENTE and | ) | |
| ERIC L. STEWART, | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | No. 1:16-cv-0055-MSM-PAS |
|  | ) | |
| ASHBEL T. WALL, DIRECTOR, | ) | |
| R.I. DEPARTMENT OF CORRECTIONS, | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Mary S. McElroy, United States District Judge.

## I. INTRODUCTION

Plaintiffs Luther Parente and Eric Stewart, inmates at the Adult Correctional Institutions ("ACI"), Rhode Island Department of Corrections ("DOC"), entered custody with severe foot injuries as well as documented mental health disorders, and they contend in this lawsuit that the DOC – and its medical staff and its supervisory correctional staff — denied and delayed critical treatment, failed to follow the instructions of outside medical personnel, forced them to walk and climb stairs with crippling injuries, and generally met their serious medical needs with deliberate indifference.

Mr. Parente had jumped from a second-floor window when being arrested. At his arraignment, his inability to walk was so obvious that he was sent by the

presiding judge to Rhode Island Hospital ("RIH"), where he was promptly admitted for four days. He was diagnosed with a calcaneal fracture of the right foot/ankle and additional fractures in his left heel and ankle, having suffered traumatic injuries to both lower extremities. (ECF No. 216-6, at 0023.) He alleges he could not walk on his own: his discharge papers from the hospital recommended crutches or a wheelchair, medication, ice, elevation of his foot, and medication for pain. Among his other complaints, he claims his wheelchair was taken away at the ACI; his crutches were taken away so that he had to crawl from his bed to a toilet; he was assigned to a top tier in the cellblock and was denied use of an elevator so that he had to struggle painfully up and down metal steps several times a day; he was never given ice for the inflammation no matter how often or whom he asked; and he was never given a special elevation pillow and when a correctional officer eventually gave him an extra regular pillow, it was taken away and he was put in disciplinary segregation for having it.[1] His efforts to obtain necessary supportive footwear were, he claims, stymied by the commissary's failure to stock his size and refusal to obtain it for him. (ECF No. 243 ¶ 542.).

---

[1] Mr. Parente also claims inadequate dental care. The claim is not that specific named DOC dentists rendered inadequate care. Rather, it is that the medical personnel with the responsibility for arranging his treatment did not respond to his dental pain with timely appointments and that he missed many appointments because correctional personnel denied him transport. While Mr. Parente was at the Intake Service Center, for example, he was able to get to only one of the many dental appointments scheduled. (ECF No. 212-29, at 93.) Because the facts in dispute in this case preclude summary judgment for or against those same defendants regarding the foot injury, the Court does not separately discuss the facts relevant to dental treatment or denial of physical therapy.

Mr. Stewart arrived at the ACI with an ankle sprain suffered while playing basketball, with discharge instructions from Kent Hospital. The instructions admonished him not to put weight on his left foot and to keep his leg elevated, applying ice packs. He asserts he was using crutches and an air cast in the weeks before his arrest. (ECF No. 217 ¶ ¶ 301-307.) He claims he was denied these devices, as well as cold packs, elevation pillows, and supportive footwear. (ECF No. 228 at 2.) Like Mr. Parente, he claims he was denied use of an elevator and was forced to painfully go up and down metal stairways to his top tier cell multiple times per day. (ECF No. 217, ¶ 322.)

Both men also arrived at the ACI with long histories of psychiatric complaints. Mr. Parente, who requested treatment for serious anxiety and insomnia, had a DOC record of psychiatric complaints going back several years. His requests for treatment were refused, as DOC's chief consulting psychiatrist defendant Martin Bauermeister, contended that *only* diagnoses of schizophrenia and bipolar disorder are sufficiently "major" to warrant mental health treatment. The doctor contends that all inmates suffer from anxiety, depression, and insomnia and that those conditions, as well as post-traumatic stress disorder, do not warrant psychological treatment in prisons. (ECF No. 212-46, at 56, 81-82.)

Mr. Stewart's psychiatric history extended back to the age of seven, and the documentation of psychiatric disorders suffered even while at the ACI is extensive. Mr. Stewart alleges he suffers from "post-traumatic stress disorder ("PTSD"), severe anxiety, alcohol dependence, opiate dependence, cocaine dependence, cannabis

dependence, attention deficit hyperactivity disorder ("ADHD"), bipolar affective disorder ("BPAD"), and severe depression. (ECF No. 164, ¶ ¶221-22.) He had a history of seizures, hospitalizations, and suicide attempts. (ECF No. 212-52, at 5.)

While the facts of their medical and psychiatric needs, and the particular care each received at the ACI, are different, their legal claims share the same foundation: that the State, top administrators of DOC, and contract and payroll medical staff of DOC failed to adequately treat them and deliberately disregarded their serious medical needs, thereby exacerbating and unnecessarily prolonging their physical pain and, in Mr. Stewart's case, the impact on his mental health of his psychiatric disorders needing treatment. These claims are embodied in eleven counts describing violations of myriad statutory and constitutional provisions.[2] The plaintiffs seek partial summary judgment on liability ("MPSJ") against all defendants (ECF No. 216). In turn, two groups of defendants have filed motions for summary judgment (ECF Nos. 218, 220, 222): the parties have collectively denominated those groups the "state defendants" and the "physician defendants."[3] Separating the defendants into

---

[2] The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. 1956 § 42-112-1 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 ("Rehab Act"), the Rhode Island Civil Rights of People with Disabilities Act ("RICRPDA"), R.I.G.L. 1956 §42-87-1, the Eighth and Fourteenth Amendments to the United States Constitution, and article 1, §§ 2 and 8 of the Rhode Island Constitution. The plaintiffs also seek relief for negligence and medical malpractice. (ECF No. 164, Second Amended Complaint, at Part I.) The Second Amended Complaint is the operative one.

[3] The state defendants are the State itself and DOC payroll employees then-Director Ashbel T. Wall (individual capacity only), Acting Director Wayne Salisbury (official capacity only), Wardens Nelson Lefebvre and Matthew Kettle, and registered nurses Michelle Garriepy, Jennifer Mageau, and Nancy Ruotolo Hull. (MSJ ECF No. 218.) The physician defendants are physicians Jennifer Clarke, Fred Vohr, Simon Melnick,

4

these groups may make logical sense from a representation point of view. From the vantage point of the claims and evidence, however, the Court will refer to the groups as "correctional defendants" and "medical defendants"; the latter group consists of the physicians and other medical providers who treated the plaintiffs, regardless of their status as contract or payroll employees of DOC.

## II.    JURISDICTION AND STANDARD OF REVIEW

Federal question jurisdiction, 28 U.S.C. §§ 1331 and 1343, lies for claims of violation of civil rights brought under 42 U.S.C. §§ 1983, and violations of the specific federal statutes listed at n.3, with supplemental jurisdiction of state-law claims under 28 U.S.C. § 1367.

Summary judgment is appropriate only when there are no genuine disputes of material fact and when the undisputed facts entitle the movant to judgment as a matter of law. *Walsh v. North Prov. Primary Care Assoc., Inc.,* 537 F. Supp. 3d 195, 200 (D.R.I. 2021). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st.Cir. 1996).

---

and Martin Bauermeister. (ECF No. 220.) Dr. Clarke and Dr. Vohr were at the relevant times medical directors of DOC facilities (ECF Nos. 212-36, at 64; 212-30, at 12); Drs. Melnick and Bauermeister were employed as treating physicians by DOC (ECF No. 164 ¶ ¶ 8, 13.) Acting Director Salisbury is sued only in his official capacity and no damages are sought from him. Dr. Tej Bansal was originally sued by Mr. Parente but dismissed. (ECF No. 207.) The claims of Plaintiff Stewart against Dr. Fred Vohr and Nurse Mageau have been dismissed. (ECF Nos. 205, 208.)

"When evaluating cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Sparkman & Stephens, LLC v. Museum Seaport Museum, Inc.,* No. 1:21-cv-00029-MSM-LDA, 2023 WL 5290956, at *2 (D.R.I. Aug. 17, 2023) (partially quoting *Bonneau v. Plumbers & Pipefitters Loc. Union 51 Pension Tr. Fund ex rel. Bolton*, 736 F.3d 33, 36 (1st Cir. 2013)).

## III.    ANALYSIS

### A. Count V: Cruel and Unusual Punishment

The starting place for evaluating a claim of inadequate medical care under the Eighth Amendment to the United States Constitution is still *Estelle v. Gamble*, 429 U.S. 97 (1976).  In *Estelle,* the United States Supreme Court held that "the government's obligation to provide medical care for those whom it is punishing by incarceration," emanates from the prohibition against "cruel and unusual punishment" contained in the Eighth Amendment.  "The infliction of [] unnecessary suffering is inconsistent with contemporary standards of decency . . . [and] deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'"  *Id.* at 103-104 (partially quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)).  Ordinary medical malpractice does not state a constitutional claim for relief.  *Id.* at 106.  It is only deliberate indifference to serious medical needs that so offends "evolving standards of decency" as to violate the Eighth Amendment. *Id.*  When it is officials acting under color of state law who are responsible for such

conduct, the claim is cognizable under 42 U.S.C. § 1983. *Leavitt v. Correctional Med. Serv., Inc.,* 645 F.3d 484, 502 (1st Cir. 2011).

The twin requirements of a "serious medical need" and "deliberate indifference" to a prisoner's condition are the criteria which any successful claim must meet. A showing of serious medical need is an objective prong, while deliberate indifference is a subjective element requiring a particular state of mind on the part of a culpable defendant. *Leavitt Corr'l Med. Serv., Inc.,* 645 F.3d 484, 498 (1st Cir. 2011). Thus, in evaluating the competing claims to summary judgment here, the Court must examine the submissions of the parties to determine whether a genuine dispute of fact exists as to either of those elements: while they may overlap, *id.,* both must be met to sustain an Eighth Amendment claim.

### 1. "Serious Medical Need"

A "serious medical need" may be one "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Perry v. Roy,* 782 F.3d 73, 78-79 (1st Cir. 2015). It may be one "that has been diagnosed by a physician as mandating treatment." *Martinez,* 2015 WL 9315562, at *3. Or it may be one in which the impact of a delay in treatment speaks to the seriousness of the need. *Rand v. Simonds,* 422 F. Supp. 2d 318, 330 (D.N.H. 2006). Both plaintiffs have produced ample evidence of a "serious medical need." As recounted above, Mr. Parente was hospitalized for four days before arriving at the ACI, and he presented there unable to walk on his own, with a discharge plan recommending crutches or a wheelchair, ice, and elevation, and medication for pain. None of the defendants seriously disputes

that Mr. Parente suffered traumatic injuries to both lower extremities after jumping from a second story.  (ECF No. 334 ¶ 10).  Pain, limited range of motion, and the need for physical therapy continued into 2019, through Mr. Parente's release from and readmission to the ACI.  During this multi-year span, he was referred to physical therapy, to a podiatrist, and to an orthopedist; he received some pain medication and at various times he was wearing a cast, using a wheelchair, or using crutches.  *See Gunther v. Castineta,* 461 Fed. Appx. 497, 501 (6th Cir. 2014) (being in so much pain that the plaintiff could not put pressure on his legs "would be 'easily recognized as needing a doctor's attention.'").  The physician defendants agree that Mr. Parente's orthopedic injuries were significant enough to constitute a "disability" (ECF No. 235-1 at 9), and, while the definition of "disability" turns more on the impact of one's injury than on its diagnosis,[4] a physical injury that meets that definition would constitute a serious medical condition.  *D'Amico v. Compass Grp.  USA, Inc.,* 198 F. Supp. 2d 18, 22, n.13 (D. Mass. 2022).  Similarly, while the medical defendants dispute whether Mr. Stewart had a physical "disability" within the meaning of the ADA, they do agree he was impaired by his ankle injury.  (ECF No. 235-1, at 9.)  Mr. Stewart was discharged from Kent Hospital, not long before his admission to the ACI, with a clear diagnosis of an ankle injury, a condition mandating treatment.  *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 208 (1st Cir.1990)

---

[4] A "disability" within the meaning of the ADA is a physical or mental impairment that substantially limits one or more major life activities.  *Snell v. Neville,* 998 F.3d 474, 500 (1st Cir. 2021) (prisoner's inability to climb stairs impeding access to law library).

(diagnosed condition). His mental health disorders are supported by ample evidence of a serious mental health need requiring treatment. *See* Part III(B)(3), "Disputed Facts," below.

### 2. Deliberate Indifference

The medical defendants dispute whether their response to these physical and mental conditions demonstrated deliberate indifference to the plaintiffs' treatment needs. They maintain they were attentive and that any failures to provide specific treatment or devices reflected disagreements in medical judgments. Deliberate indifference requires a culpable state of mind more than that of mere negligence, but less than intentional conduct. *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 162 (1st Cir. 2006). The requirements for proving deliberate indifference are that prison officials knew that a substantial risk of harm to the prisoner existed (or they were aware of facts from which an inference of substantial risk could be drawn and drew that inference) but disregarded it. *Leavitt,* 645 F.3d at 497. Awareness may be inferred if the risk is obvious, *Burrell v. Hampshire County.*, 307 F.3d 1, 8 (1st Cir. 2002), but the official may rebut by showing the risk might have been obvious to others but not to him. *Id.* Deliberate indifference may arise from intentional conduct, *Estelle,* 429 U.S. at 104-05, or it may be inferred. *MacLeod v. Kern*, 424 F. Supp. 2d 260, 266 (D. Mass. 2006) (citing *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993)) (inference of indifference from delay in medication treatment until prisoner was substance-free for one year).

Disagreements about proper medical care do not lay a foundation for Eighth Amendment violations. *Watson v. Caton*, 984 F.2d 537, 540 (1st Cir. 1993) (upholding dismissal of claim with a finding that a physician's rejection of a prisoner's desire for physical therapy, drugs, and rest was merely a disagreement about the proper course of treatment and not deliberate indifference). Nor, generally, do disagreements about the adequacy of the medical treatment. A mere disagreement about the choice of medical treatment, or a disagreement that results from opposing medical judgments, does not constitute a denial of treatment. *Sires v. Berman,* 834 F.2d 9, 13 (1st Cir. 1987).

### 3. Disputed Facts

The disputes in the record concerning the seriousness of the injuries are intertwined with the issue of deliberate indifference. The plaintiffs have produced sufficient evidence, much of which is contested by the medical defendants, that they suffered from serious physical and mental health conditions, and that their treatment was episodic, very delayed, and not adequately responsive to their suffering. The plaintiffs have produced evidence which, if believed, shows a pattern of unresponsiveness and denial of basic treatment, even in the face of specific recommendations from diagnosing physicians. For example, Mr. Parente was discharged from RIH with a wheelchair and a recommendation not to put any weight on his right foot and only minimal weight on his left, a carter pillow used for elevating his leg, a direction to ice the leg to reduce the swelling, splints on both legs and instructions to keep his splints dry. He maintains in sworn testimony that his

10

wheelchair was taken away because he had crutches[5], that he was later denied crutches, that the carter pillow he brought from the hospital was taken away,[6] and that despite many requests he was *never* given ice.  These were not only initial discharge instructions, but repeated when he was seen again at RIH on April 7, 2015, three weeks after his transfer to the ACI.  Mr. Stewart makes similar allegations.  As for him, the medical defendants maintain that the records of his injuries showed only "mild" and "minimal" abnormalities that did not require more than the treatment he was given.  (ECF No. 236 ¶ ¶ 354, 360.)

The defendants do contest the impact of the injuries and the care and assistance that was required.  For example, they disagree that plaintiff Parente, even immediately upon discharge from the hospital, was unable to get himself around. (Physicians SDF, ECF No. 236 ¶ ¶ 21, 29.)  Another contested issue is how much Mr. Parente voiced being in pain, appeared to be in pain, or asked for medication.  *Id.* ¶ ¶ 45, 46, 48.  In the 535 numbered responses of the medical defendants to the Plaintiffs Statement of Disputed Facts, they appear to dispute that icing, a carter pillow, a trauma chair with rails, a toilet with rails, and other items were ordered by the

---

[5] Dr. Melnick allegedly ordered the wheelchair taken away because an inmate cannot have both a wheelchair and crutches.  But Warden Kettle testified that an inmate's crutches would be taken away only if they had been used as a weapon.  (ECF No. 212-41, at 52-53.  He also testified that there was no security-driven rule prohibiting an inmate from having both a wheelchair and crutches if medically advised.  *Id.* at 62. Warden Lefebvre agreed.  (ECF No. 212-29, at 51.)   In late April, the crutches were allegedly taken away also.

[6] According to Mr. Parente, not only was the pillow he brought from the hospital taken away, a *second* pillow given to him by Deputy Warden Meunier was taken away because it had not been ordered by DOC medical staff; he was then disciplined and placed in segregation for having an unauthorized item.

diagnosing doctors at RIH or were necessary.  As for some items, such as ice, some medical defendants claim they were never asked for it.  (*e.g.*, ECF No. 236, ¶ 64.)  Dr. Melnick contends his denial of certain items, such as ice and a handicapped toilet, was a matter of medical judgment.  For example, Dr. Melnick suggests that he made a considered judgment concerning Mr. Parente's Percoset medication when he rejected the recommendation by an outside physician, *Id.* ¶ 52; that he believed ice was not necessary, (ECF No. 217 ¶ 57); that the failure to provide a wheelchair was made after a review of medical consultation notes and that Mr. Parente had sufficient use of crutches, *Id.* ¶ ¶ 116, 133; and that the withdrawal of crutches was made along with a referral to physical therapy, *Id.* ¶ 136.   Dr. Melnick proffers a rationale for why he prescribed Neurontin and Motrin.  *Id.* ¶ 55, citing Exh. T, 109:10-110:12.  The nurses dispute Mr. Parente's testimony that he voiced complaints of pain, and they maintain he neither appeared to be in pain nor requested pain medication.  *Id.* ¶ ¶ 45, 48.  As to Mr. Stewart, there is a dispute over how much Dr. Melnick was aware of the condition of his ankle.  (ECF No. 236 ¶ 320.)  Indeed, the medical defendants do not agree that he was so injured as to require any accommodation (DCF 236 ¶ 322.)

Dr. Melnick has supported his assertion that he treated both plaintiffs' conditions adequately and not negligently with expert reports from Dr. Jeffrey C. Fetter, who concluded after a review of records that Dr. Melnick did not breach the standard of care with respect to either the orthopedic or mental health needs of the plaintiffs.  (ECF Nos. 212-32, 212-70).  The plaintiffs have submitted the contrary

reports of Dr. Lawrence J. Guzzardi, who concluded that both plaintiffs received substandard orthopedic and mental health care.[7]

A jury could conclude, if it believed the defendants, that there were disputes of reasoned medical judgments that explained their declining to treat the plaintiffs' physical injuries in certain ways. On the other hand, there is ample evidence that treatments – such as ice and devices for elevation – were not rejected as medically unnecessary, but instead were unavailable because of unresponsiveness. Similarly, a jury could decide that the plaintiffs were required to climb to top tiers repeatedly because no one took their pain seriously enough or, instead, that medical staff legitimately judged them able to bear the stress of stairs. Those disputes preclude summary judgment.

Summary judgment must also be denied with respect to the allegations that serious mental health issues were inadequately treated. The physician defendants admit that Mr. Stewart had made previous suicide attempts. (ECF No. 221 ¶ 6.) Dr. Bauermeister was the psychiatrist primarily responsible for both plaintiffs' behavioral health needs. Dr. Bauermeister disputes altogether that Mr. Parente needed mental health treatment because he did not suffer from either schizophrenia or bipolar disorder which, in the doctor's opinion, are the only conditions warranting

---

[7] The Guzzardi report addresses specific failures concerning, among other things, ice, shoes, elevation pillow, medication for pain, a damaged cast, the failure to splint Mr Parente's left foot, or provide a cane. (ECF No. 212-15 ¶ ¶ 3 – 9.) The Guzzardi report establishes, if found credible, the standard of care with respect to the malpractice and negligence claims against the medical defendants. *See Boccasile v. Cajun Music Ltd.,* 694 A.2d 686, 690 (R.I. 1997) (plaintiff's burden to show standard of care and deviation therefrom).

mental health treatment in a prison. Dr. Bauermeister maintains that his review of Mr. Stewart's medical records was adequate, that his pronouncement in June 2015 of "no psychiatric history," and that removal of Mr. Stewart from monitoring were justified. Mr. Stewart contends that his failure to receive mental health treatment until late July 2015, his having been told to wait his turn and be patient, and the failure to be provided with medication until August, constituted deliberate disregard. Thus, the dispute over what treatment was necessary is genuine and extensive.

### 4. Correctional Defendants

Three correctional defendants have been sued for unconstitutional medical treatment based purely on their administrative positions: then-Director Wall and Wardens Kettle and Lefebvre. Defendant Wall was, at the time, Director of Corrections; defendants Lefebvre and Kettle were Wardens of facilities in which the plaintiffs were housed; Drs. Clarke and Vohr were both Medical Directors. The plaintiffs allege that these defendants, manifesting deliberate indifference, failed to act to remedy a situation of constitutional violation of which they were aware. *Beers v. New Hampshire State Prison,* No. 20-cv-968-LM, 2021 WL 6883386, at *5 (D.N.H. Dec. 15, 2021).

Mr. Parente has failed to sufficiently allege the combination of specific conduct and actual knowledge on the part of either then-Director Wall or Warden Kettle. Mr. Parente acknowledged he never spoke to Director Wall directly but believed his parents had written to the Director about his difficulty with steps and he was unaware of a response. (ECF No. 212-6, at 193.) This is insufficient evidence of the

Director's knowledge or personal conduct.  There is also no evidence of Director Wall's adoption of a specific policy resulting in the inadequacy of care to either plaintiff. Warden Kettle was aware of Mr. Parente's inability to obtain supportive shoes while in segregation, and apparently was instrumental in having Mr. Parente released from segregation early.  (ECF No. 212-6, at 195-96, 197.)   Indeed, Mr. Parente acknowledged that Warden Kettle did not act with deliberate indifference to his needs.  *Id.* at 197.  As to Warden Lefebvre, however, Mr. Parente testified that the Warden was informed of the pain climbing the tiers caused him and his inability to obtain supportive shoes but responded that there was nothing he could do.  *Id.*  Mr. Parente also turned to him when his elevation pillow was taken away but obtained nothing from him.  *Id.* at 193-94.  Warden Lefebvre's involvement with what was essentially a medical need was far less than that of the medical defendants.  But Mr. Parente has claimed, and supported with sufficient evidence, that he was in horrible pain because of his inability to walk, forced to climb multiple tiers while denied use of an elevator and obstructed in his attempt to obtain supportive shoes.   He has produced evidence that he could have been accommodated by correctional staff, in particular Warden Lefebvre, but wasn't.

As for Mr. Stewart, he testified that he had no real contact with the correctional defendants.  (ECF No. 213-30, *passim.)*  He took up his complaints with the medical defendants.  While he sometimes notified correctional lieutenants of his complaints, there was no evidence that the information ever reached the correctional defendants sued.  Thus, the required subjective prong of awareness cannot be met.

The Motions of defendants Wall, Kettle, and Lefebvre on Count V are GRANTED as to Mr. Stewart. The motions of defendants Wall and Kettle on Count V are granted as to Mr. Parente, but the motion of defendant Lefebvre on Count V is DENIED as to Mr. Parente. Nurse Hull, according to the plaintiffs' evidentiary submissions, played only a limited role in Mr. Stewart's treatment, *see* Part III(G)(1), *infra.* Her Motion for Summary Judgment on Count V is GRANTED with respect to Mr. Stewart. All other Motions for Summary Judgment on Count V are DENIED.

### 4. Qualified Immunity

The Court declines to grant summary judgment based on qualified immunity, as requested by the state-employed defendants. The qualified immunity analysis is a two-step one. First, the Court must determine whether a constitutional violation has occurred. *Stamps v. Town of Framingham,* 813 F.3d 27, 34 (1st Cir. 2016). In this case, for the reasons stated above, the Court believes the plaintiffs have supported with competent evidence their assertion of constitutional violation, subject to findings of fact that must be made by a jury. Next, the Court must determine whether the right violated has been clearly established. *Id.* at 39. That cannot be seriously disputed. The right to adequate medical treatment has long been acknowledged and its contours are defined. *Id.* For nearly a half-century, *Estelle v. Gamble*, 429 U.S. 97 (1976), has commanded that the serious medical needs of prisoners be attended to, and the First Circuit has frequently upheld the vulnerability to liability of prison officials who have shown deliberate disregard of the right. *E.g.*, *Perry v. Roy,* 782 F.3d 73, 79 (1st Cir. 2015) (mouth injury); *Miranda-*

*Rivera v. Toledo-Davila*, 813 F.3d 64, 74–75 (1st Cir. 2016) (denial of medical care to
arrestee).

Qualified immunity is denied all defendants sued in their individual capacities.

### 5. Official Capacities

Just as the State cannot be sued for damages under 42 U.S.C. § 1983, *Will v.
Michigan. Department of State Police,* 491 U.S. 58, 71 (1989), state officials in their
official capacities are not persons who can be sued for damages under that statute.
*Jones v. Rhode Island,* 724 F. Supp. 25, 28 (D.R.I. 1989). Therefore, the Motions for
Summary Judgment of the State and any claims for damages against defendants sued
in their official capacity in Count V are GRANTED.

### B. Counts VI and VIII: State Constitutional Claims

Two of the Counts are grounded in Rhode Island state constitutional
provisions: Count VI (cruel punishments, R.I. Const., art. 1, § 8); and Count VIII
(equal protection, R.I. Const. art. 1 § 2). This is in addition to those counts claiming
violations of the federal Constitution brought through the statutory vehicle of 42
U.S.C. § 1983. Section 1983 creates a cause of action when state officials violate
federally guaranteed rights, but there is no state analog creating a general cause of
action for violating rights guaranteed by the Rhode Island Constitution.

Without any analog to § 1983, the plaintiffs assert direct causes of action, like in
*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388
(1971). The Rhode Island Supreme Court does not recognize a direct cause of action
in the anti-discrimination clause of R.I. Const., art. 1, § 2. *Doe v. Brown Univ.,* 253

A.3d 389, 401 (R.I. 2021).  Whether there is a direct cause of action under R.I. Const., art. 1, § 8 is a slightly different question because the United States Supreme Court has recognized a private cause of action directly under the Eighth Amendment. *Carlson v. Green*, 446 U.S. 14, 19-20 (1980) (inadequate medical treatment in prison). The Rhode Island Supreme Court acknowledged *Carlson* in *State v. Bandoni,* 715 A.2d 580, 586 n.8 (R.I. 1998).   But *Bandoni* neither noted nor implied that the Rhode Island Supreme Court would interpret the state "cruel punishment" provision similarly to *Carlson* with respect to a direct state constitutional cause of action and, indeed, the mention of *Carlson* is accompanied by a caution that the U.S. Supreme Court looks at direct causes of action differently now than it did when *Bivens* was decided.   *Id.,* noting *Fed. Dep. Ins. Corp. v. Meyer,* 510 U.S. 471, 484 (1994). Considering *Doe* and *Bandoni,* the Court declines to recognize the direct causes of action the plaintiffs seek.

Summary judgment is GRANTED on Counts VI and VIII for all defendants and the plaintiffs' Motion is DENIED.

### C.  Counts I through IV:  Statutory Claims

The plaintiffs seek relief under four statutory schemes: (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; (2) the Rehabilitation Act, ("Rehab Act") 29 U.S.C. § 794; (3) the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. § 42-112-1; and (4) the Rhode Island Civil Rights of People with Disabilities Act ("RICRPD"). Count I (ADA) and Count III (Rehab Act) – the two federal question counts — are brought against the State alone.   Counts II and IV are brought against the State as

well as the same group of individual defendants Wall, Lefebvre, Kettle, Clarke, Melnick, Bauermeister, Garriepy, Mageau, and Hull.[8]  In general, the state analogs to the federal statutes are identical in elements and in the analysis applied to determine whether a violation has occurred.  RICRA, which has been applied in Rhode Island primarily although not exclusively to situations of employment,[9] *Doe v. Brown University,* 253 A.3d 389 (R.I. 2021), employs the federal *McDonnell-Douglas* burden-shifting paradigm.  *Mosunic v. Nestle Prepared Foods Co.,* 274 F. Supp. 3d 22, 26 (D.R.I. 2017).  RICRPD uses the same analytic framework as the ADA.  and explicitly adopts the ADA definition of disability and specifies the same elements of a cause of action for failure to accommodate.  *Washington v. Honeywell Intern'l Inc.,* 323 F. Supp. 3d 309, 317-18 (D.R.I. 2018).  The federal statutes also substantially overlap with each other.  The Rehab Act declares that the standards to determine whether a violation has occurred "shall be the standards applied under Title 1 of the Americans with Disabilities Act of 1990" in the area of employment and the ADA declares that its "remedies, procedures, and rights" shall be those set forth in the

---

[8] Plaintiff Stewart dismissed his claims against Nurse Mageau.  (ECF No 205.)

[9] RICRA has not been expressly limited to employment or contract situations in Rhode Island case law.  It has been termed a "broad civil rights act that would both complement and supplement federal civil rights protections" by the First Circuit. *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 67 (1st Cir. 2004).  *See Olofinlade v. Atmed Treatment Ctr., Inc.,* No. 19-cv-0210JJM-LDA, 2020 WL 1848084, at *3 n.3 (D.R.I. Apr. 13, 2020) (RICRA has been "broadly construed to extend liability to any individuals who violate the statute through discriminatory conduct." *Accord, Khattab v. Barney,* No. C.A. 14-261 ML, 2015 WL 1213181, *2 (D.R.I. Mar. 17, 2015) (RICRA "does not limit potential liability to employers and has been broadly construed to extend liability to any individuals who discriminate in ways that violate the statute.").

Rehab Act. 42 U.S.C. § 12132. They both apply to actions of state and local governments, *Phelps v. Carr,* No. 07-40245-GAO, 2010 WL 3895461, at *3 (D. Mass. Sept. 30, 2010), and in practical respect, they share identical analyses. *Nunes v. Mass. Dep't of Correction,* 766 F.3d 136, 144-45 (1st Cir. 2014). Medical care "is one of the 'services, programs, or activities' covered by the ADA." *Kiman v. N.H. Dep't of Corr.,* 451 F.3d 274, 284 (1st Cir. 2006). The other two statutory causes of action, RICRA, and RICRPD, give rise to individual liability. *Wyss v. Gen. Dynamics Corp.,* 24 F. Supp. 2d 202, 211 (D.R.I. 1998); R.I.G.L. § 42-87-2 (forbids disability discrimination "by any person or entity").

The actions under all four statutes, in Counts I through IV of the Complaint, presume assertions of disability and claim that the defendants failed to provide them a reasonable accommodation and needed services. The same genuine disputes of material facts that preclude summary judgment on the plaintiffs' § 1983 claim also rule out summary judgment on the statutory quartet. The dispute over how serious the plaintiffs' medical injuries were that results in a contest of facts over the type and frequency of treatment required plays into whether the injuries constituted a disability: whether they "substantially limit[ed]" one or more major life activity. Major life activities, as related to this case, include walking and standing – both implicated by the foot injuries the plaintiffs were suffering from when they entered the ACI. R.I.G.L. § 42-87-1.

While the defendants agree that Mr. Parente suffered from a "disability," they do not agree that Mr. Stewart did as well. To the contrary, the medical defendants

maintain there was "no pathological basis for [his] symptoms." (ECF No. 220-1 at 4; record citations contained therein.) To support this defense, they rely on evidence from the records that tends to show that Mr. Stewart suffered from a simple ankle sprain and received the only thing he asked for: a brace. *Id.* at 15-17. Mr. Stewart, for his part, relies largely on the medical opinions of the physicians at Kent County Hospital who prescribed cold packs, elevation pillows, supportive footwear, and walking aids. (ECF No. 228 at 2 and record citations therein.) There are many disputes of fact about whether there was a need for accommodation and whether, if there were, the defendants extended it. Finally, there is a dispute over which defendants, if any, would have been responsible for providing that accommodation.

The plaintiffs have produced sufficient evidence to support a finding by a jury that both plaintiffs suffered from a disability that impeded a major life activity, that reasonable accommodations existed to remove the obstacles to their mobility, and that the medical defendants failed to afford them those accommodations. For their part, those defendants have created genuine issues of material fact around those elements.

### D. Supervisory Correctional Defendants

The same discussion of personal knowledge and conduct relevant to the supervisory correctional staff on Count V governs here. The evidence submitted by the plaintiffs, if believed, supports knowledge only on the part of Warden Lefebvre with respect to Mr. Parente. According to Warden Kettle, he and Warden Lefebvre had the authority to order disability accommodations. (ECF No. 212-41, at 16.)

Correctional staff had the authority and responsibility to give prisoners lower-tier cells if they "see an inmate having trouble with mobility on the stairs." *Id.* at 42.

As to the medical supervisors, neither Dr. Vohr nor Dr. Clarke were treating physicians, but they each personally reviewed Mr. Parente's records and were aware, or should have been aware, that he was being denied recommended – and, in the plaintiffs' view, necessary – physical therapy because he was in segregation. *See* citations to the record in Plaintiffs' Memorandum ECF No. 216, at 38-39. Dr. Clarke also fielded calls and complaints from both Mr. Parente and his mother. *Id.* Similarly, Mr. Stewart was not given physical therapy despite multiple directions for it. *Id.* at 44. The plaintiffs' expert has concluded that the oversight from Drs. Vohr and Clarke was wanting, and that under their directorship record-keeping and communication was lax. (ECF No. 212-52 at 22; No. 212-15 at 18-19.)[10]

Defendants Wall and Kettle are GRANTED summary judgment on Counts II and IV with respect to both plaintiffs. Defendant Lefebvre is granted summary judgment on Counts II and IV with respect to plaintiff Stewart. All other Motions for Summary Judgment on Counts II and IV are DENIED, subject to Part III(H), *infra,* which grants summary judgment to the State on Count IV.

### E. Count VII: Equal Protection

The plaintiffs claim vindication through 42 U.S.C. § 1983 for a violation of their right to equal protection under the United States Constitution. They have not moved for summary judgment on this claim and nowhere explain how they have been treated

---

[10] Plaintiff Stewart has dismissed his complaint against Dr. Vohr (ECF No. 208).

differently from others similarly situated.  The defendants' Motion for Summary Judgment on Count VII is GRANTED.

### F.  Count IX:  Due Process Under *Morris* Rules and R.I.G.L. § 42-56-29.

Count IX claims a denial of the right to due process.  The plaintiffs have failed to brief a denial of substantive due process and have therefore waived any such claim.  *See* Plaintiffs Memorandum in Support of Partial Summary Judgment, ECF No. 216-1.  The plaintiffs' companion citation of R.I.G.L. § 42-56-29 implies they ground the due process claim on a breach of DOC's statutory duty to do a medical assessment of every prisoner's needs in the intake process.   To the extent that the claim is based on a violation of state law, that "'is a matter primarily of concern to the state and does not implicate the Constitution'—absent 'fundamental procedural irregularity, racial animus, or the like.'"  *Roy v. City of Augusta*, 712 F.2d 1517, 1523 (1st Cir. 1983) (quoting *Creative Env'ts Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982)).

The *Morris* Rules are a series of proscriptions contained in a consent judgment entered in the litigation of *Morris v. Travisono,* 509 F.2d 1358 (1st Cir. 1975).   The plaintiffs have failed to brief the *Morris* Rules contention.  Even had they briefed this issue, they would not be able to obtain relief, as the *Morris* Rules neither create a right of individuals to enforcement in actions for damages, *Hicks-Hinson v. Dep't of Corrections,* C.A. No. 20-141-JJM-PAS, 2021 WL 978809, at *1 (D.R.I. Mar. 16, 2021), nor a basis for injunctive relief, which is available only within the *Morris* case itself.  *Id.*  Summary judgment is GRANTED to all defendants named in Count IX.

### G.  Counts X and XI:  Negligence and Medical Malpractice

These are supplemental state-law claims, based on the same factual evidence that is relevant to Counts I through V and discussed above.

#### 1.  Nursing Care

Correctional defendants Garriepy, Mageau, and Hull, who all provided nursing care, seek summary judgment on the grounds that they are not proper defendants in a medical malpractice action.  Medical malpractice claims are authorized under R.I.G.L. § 5-37-1(8), which defines the cause of action as

> any tort, or breach of contract based on health care or professional services rendered, or which should have been rendered, by a *physician, dentist, hospital clinic, health maintenance organization, or professional service corporation* providing health care services and organized under chapter 5.1 of title 7, to a patient . . .

(emphasis supplied).  Whether a nurse can be sued for malpractice, particularly when practicing outside the rubric of a "hospital clinic, health maintenance organization, or professional service corporation," appears not to have been squarely decided by the Rhode Island Supreme Court.  Rhode Island case law includes at least one medical malpractice action brought against a nurse.  *Owens v. Silvia,* 838 A.2d 881, 886 (R.I 2003) (nurse Paolino sued) (vacating judgment for defendants without discussion of nurse as proper defendant).

In *Boccasile v. Cajun Music Ltd.,* 694 A.2d 686, 690 (R.I. 1997), a wrongful death action against a nurse, the Court cited with approval – *albeit for a different purpose – Ramage v. Central Ohio Emergency Services, Inc.,* 592 N.E.2d 828, 834 (Ohio 1992), which noted that nurses were not proper defendants for medical

malpractice in Ohio. Contrary to the correctional defendants' assertion, however, ECF No. 218-1, at 20, *Boccasile* does not hold that they are not properly sued in Rhode Island. *Boccasile* was a wrongful death action primarily discussing negligence, not medical malpractice. *Vigue v. John E. Fogarty Mem. Hosp.,* 481 A.2d 1 (R.I. 1984), also cited by the correctional defendants, is more helpful although not definitive. In *Vigue,* the hospital and "an unknown nurse" were sued and the question was whether the three-year statute of limitations for negligence or two-year limitations period for medical malpractice controlled. *Id.* at 2. The Court determined that because the claim involved "professional services that were rendered" (by the nurse, who permitted the plaintiff to walk to the bathroom by herself), it sounded in malpractice. *Id. Vigue* is not itself determinative, however, because the *hospital* was sued and the nurse was not a party because her identity was unknown.

The nurse defendants here point to the two-justice dissent in *Vigue* that posed the direct question of whether "lack of due care by a nurse falls within the limited area of negligence known as medical malpractice." *Id.* at 5 (Shea, dissenting). The dissent cites "the unanimous holding in states with similar statutes of limitations for medical malpractice claims that the negligence of a nurse constitutes ordinary negligence rather than medical malpractice." *Id.* at 6. In assessing the majority's analysis, the dissenters attributed *Vigue's* holding to the fact that the *hospital* was the defendant ("We should not extend the meaning of the term 'medical malpractice' beyond claims against physicians and surgeons merely because a hospital is named as a defendant.") *Id.* That characterization is bolstered by the majority's note that

its holding was "not based upon the common-law definition of 'malpractice,'" but on the express provision for institutional liability in R.I.G.L. § 5-37.1-1(f).  *Id.* at 4, n.5. Thus, *Vigue* is fairly read as discussing the character of nursing services only to determine whether they are "professional services" rendered by a hospital under § 5-37.1-1(8).

It is the plaintiffs' burden to demonstrate a cause of action against the three nurses based on medical malpractice.[11]  To the extent there is a lack of clarity in Rhode Island law, the burden of it must be borne by the plaintiffs.  Therefore, the Motions for Summary Judgment of defendants Garriepy, Mageau and Hull on Count XI are GRANTED.

Regarding the negligence claim, the nurses contend the factual allegations against them are too "scant" to support relief.  (ECF No. 218-1, at 19.)  The Court disagrees.  All three are alleged to have failed to assess Mr. Parente's pain, refusing to provide ice, and refusing to help him obtain pain medication prescribed upon his discharge from the hospital. (ECF No. 1, ¶ ¶ 51-52, 53-54, 55-58, 61-62, 81.)  They also are alleged to have ignored the problem of Mr. Parente's degrading and broken casts as well as ignoring his need for an elevator when assigned to top tiers.  The three nurses were part of the medical provider team, and they shared a duty to

---

[11] The plaintiffs put forth a curious response to this point.  In their Objection to the correctional defendants' Motion for Summary Judgment, they give a 2-sentence short shrift to the defendants' textual argument, calling it "pointless definitional hair-splitting" because "[m]edical malpractice is simply a form of negligence."  (ECF No. 233, at 16.)  It was the plaintiffs, however, who *chose* to sue the nurses not only for negligence but for medical malpractice.  They can hardly fault the defendants for their reaction to what the plaintiffs seem to agree is duplication of claims.

provide adequate care imposed by law.  Their defenses are largely factual.  Nurse Garriepy, for example, contends she followed medical instructions regarding medication and disputes how much Mr. Parente complained of pain.  (ECF No. 212-18 at 17, 29.)  Although she was the intake nurse for both plaintiffs, she reviewed none of their medical records; she was unfamiliar with Mr. Stewart's discharge instructions from Kent Hospital concerning care of his foot and disputes what Mr. Stewart alleged he told her about the condition of his foot.  *Id.* at 32.  She testified, however, that she did not pursue whether Mr. Stewart should receive medication at DOC because he did not ask for any – a practice that falls below the applicable standard of care for someone with his extensive mental health diagnoses, according to the plaintiff's expert.  (ECF No. 212-52, at 20.)

There was less contact with the plaintiffs by Nurse Hull.  In her deposition, however, she acknowledged a number of times that Mr. Parente appeared in her medication line and, for one reason or another, she failed to react positively:  for example, she took no action regarding his request for Motrin or ibuprofen because he was already on Naprosyn; on another occasion, although he asked about the availability of his headache medication Fioricet, she said she did not help him obtain it because he did not explicitly say he had a headache.  *Id.* at 33.  The plaintiffs assert that she did not provide him with ice at all.  Mr. Stewart contends that Nurse Hull overmedicated him on at least one occasion.  (ECF No. 212-53, at 48.)  Nurse Mageau encountered Mr. Parente twice during one overnight, just after his entry into the ACI.  She testified he had a wheelchair and splints at the time.   She denied ever being

asked for ice by Mr. Parente, which is a factual dispute. (ECF No. 212-23, at 67-68.) She said when she encountered him, he did not ask for medication, had no complaints, and did not appear in pain. *Id.* at 39-40. Her contact with Mr. Stewart was when dispensing medication to him in medication lines. *Id.* at 44. She referred him once for psychiatric observation. *Id.* at 50.

After considering the alleged conduct by these three nurses, as well as the fact that the plaintiff's expert has offered no opinion that the care of Mr. Stewart by Nurses Hull was below the standard of applicable care, the Court GRANTS the Motion for Summary Judgment of defendant Hull with respect to Mr. Stewart's negligence claims.

### 3.  State as Defendant

The State maintains that it is not included in the statutory definition of those amenable to suit for medical malpractice and is therefore entitled to summary judgment on the claim brought by plaintiff Stewart. Mr. Stewart has not responded to this contention and it seems to the Court, from the face of the statute, that the State is correct. The State argues that correctional defendants Wall, Kettle, and Lefebvre are not medical professionals or providers and cannot be sued for medical malpractice. The Court agrees. Therefore, the Motions for Summary Judgment of the State and defendants Wall, Kettle, and Lefebvre on Count XI is GRANTED.

### 4. Disputed Facts

Because of the genuine disputes of material fact identified in the Court's discussion above at Part III(A)(3), summary judgment on Counts X (medical malpractice) and XI (negligence) is DENIED to all remaining parties.

## H. Eleventh Amendment Immunity

The State claims Eleventh Amendment sovereign immunity for the state-law claims contained in Counts I through IV, VI, VIII, and IX. The Court has already GRANTED the Motions of all defendants for Summary Judgment on Counts VI, VIII, and IX, as well as for the State on Count IV. As to the remaining claims, Rhode Island has enacted a broad waiver of sovereign immunity statute. "[RIGL] Section 9-31-1 subjects the state and its political subdivisions to liability in all actions of tort 'in the same manner as a private individual or corporation.'" *Laird v. Chrysler Corp.,* 460 A.2d 425, 427 (R.I. 1983) (holding immunity waived in federal as well as state courts). The statute contains "sweeping language abrogating the sovereign immunity of the state as well as all other political subdivisions in Rhode Island." *Id.* at 428. The Rhode Island Supreme Court, noting its multiple decisions on the waiver of immunity, as well as those of the federal courts, declared that "none of the limitations or interpretations of this court provide venue or procedural restrictions that might prevent a plaintiff from bringing an action in federal court." *Id.* at 430. "A damages action [under the Civil Rights Act of 1968] sounds basically in tort – the statute merely defines a new legal duty and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *Curtis v. Loether,* 415 U.S.

189, 195 (1974).  The defendants cite *Acevedo Lopez v. Police Department of the Commonwealth of Puerto Rico,* 247 F.3d 26, 29 (1st Cir. 2001), for the proposition that the omission of language waiving immunity in the specific statute precludes a finding that immunity has been waived.  But *Acevedo* does not reference any general waiver of immunity statute in *Luc*Puerto Rico, much less one comparable to the "sweeping" waiver of the Rhode Island statute.   Contrary to what *Acevedo Lopez* declared under Puerto Rican law, the Rhode Island Supreme Court has held that a waiver of sovereign immunity may be implicit and need not be express in the statute that gives rise to the cause of action.  *Pellegrino v. R.I. Ethics Com'n,* 788 A.2d 1119, 1123-24 (R.I. 2002) (waiver necessarily implied by creation of remedy).

The critical question is whether discrimination actions sound in tort, because if they do, the intention of the General Assembly was to waive its sovereign immunity.

> [T]he Rhode Island Tort Claims Act is remarkable for both its substantive breadth and its procedural simplicity.  While other states were clinging fast to their tort immunity or giving a consent to suit that was hedged with exceptions and conditions, Rhode Island enacted legislation that was straightforward, uncomplicated, and unreserved.

*Marrapese v. State of R.I.,* 500 F. Supp.1207, 1221-22 (D.R.I. 1980) (holding that immunity extends to suits in federal court.[12]

The First Circuit has held that claims made under RICRA are claims for "injuries to the person" and, as such, share the statute of limitations for torts

---

[12] In *Luceus v. Rhode Island,* No. 15-489ML, 2016 WL 7971311, at *5 (D.R.I. Dec. 13, 2016), *adopted* 2017 WL 318646, at *1, a Magistrate Judge recommended that § 9-31-1 not be construed as a waiver of sovereign immunity with respect to RICRA.  The *Luceus* RICRA holding has not been cited by any Court, however.

generally. *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 70 (1st Cir. 2004).[13]  Indeed, it noted the Rhode Island Supreme Court's consistent treatment of civil rights violations as injuries to the person. *Id.* at 67.  The plaintiffs have cited several cases from other jurisdictions agreeing with the notion that a civil rights disability discrimination claim sounds in tort. *See e.g.*, *McMillan v. Lincoln Fed. Sav. & Loan Ass'n,* 678 F. Supp. 89, 92 (D.N.J. 1988) ("As in *Curtis*, this Court finds that a damages action under the [New Jersey Law Against Discrimination] sounds basically in tort"); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1120-21 (10th Cir. 1995) (terming wrongful disability discrimination a "state law tort claim"); *Mancuso v. Douglas Elliman LLC,* 808 F. Supp. 2d 606, 632 (S.D.N.U. 2011) (lost profits not available under fair housing law because those actions sound in tort).  Since an action brought under RICRA sounds in tort, Rhode Island's general waiver of sovereign immunity statute requires us to find that immunity has been waived.

The action brought under RICRPD is a different matter.  That statute includes a specific provision that actions under it are to be brought in the superior court. R.I.G.L. § 42-87-4.  It would be difficult to reconcile that section with the intentional relinquishment of immunity in a lawsuit brought in federal court.  "In order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the state's intention to subject itself to suit in

---

[13] *Rathbun's* holding has been nullified by the Rhode Island Supreme Court, but only in the context of employment discrimination claims because of its relationship to the Fair Employment Practices Act, R.I.G.L. § 28-5-1 *et seq.*  *Horn v. Southern Union Co.,* 927 A.2d 292, 295 (R.I. 2007).

*federal court.*"  *Acevedo Lopez,* 247 F.3d at 28 (emphasis original).  The plaintiffs ask the Court to find an implied waiver in RICRPD and, while that is possible in RICRA, it makes the situation at least ambiguous with regard to RICRPD.  And sovereign immunity must be clearly waived if it is not to be a bar to suit.

Therefore, the Motion of the State for Summary Judgment is GRANTED as to Count IV and DENIED as to Count II.  The plaintiffs' Motion for Summary Judgment is DENIED as to both.

## IV.  CONCLUSION

**Count I** and **III:**  The State and Plaintiffs are DENIED summary judgment.

**Count II** and **IV:** Director Wall and Warden Kettle are GRANTED summary judgment with respect to both plaintiffs; Warden Lefebvre motion is GRANTED only as to Mr. Stewart.   The State is GRANTED summary judgment on Count IV.  All other motions for summary judgment are DENIED.

**Count V:**   The State, Director Wall, and Warden Kettle are GRANTED summary judgment as to both plaintiffs.  Warden Lefebvre and Nurse Hull are GRANTED summary judgment as to Mr. Stewart.  Summary judgment is DENIED to the plaintiffs and remaining defendants.

**Count VI, VII, VIII, and IX:**  Summary judgment is GRANTED to all defendants.  The plaintiffs Motion for Summary Judgment is DENIED.

**Count X:**  Summary Judgment is GRANTED to defendant Hull on the claim brought by Mr. Stewart.  All other Motions for Summary Judgment are DENIED.

**Count XI:**  Summary Judgment is GRANTED to defendants State of Rhode Island, Wall, Kettle, Lefebvre, Garriepy, Hull, and Mageau.  It is DENIED to the remaining defendants and the plaintiffs.

IT IS SO ORDERED:

_____

Mary S. McElroy,
United States District Judge
Date:  December 22, 2023